Filed 9/28/23  P. v. Lane CA3

## NOT TO BE PUBLISHED

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>  v.<br><br>PATRICIA LANE,<br><br>    Defendant and Appellant. | C094996<br><br>(Super. Ct. No. 19FE010439) |

Over the course of many years, defendant Patricia Lane molested her three sons and her younger half-brother, who was born within weeks of one of her sons.  The victims disclosed the sexual abuse years after it occurred.  A jury found defendant guilty of four counts of lewd and lascivious acts with a child under the age of 14 and found true a multiple victim allegation.  The trial court sentenced defendant to four consecutive terms of 15 years to life in prison.

1

On appeal, defendant claims the trial court abused its discretion by improperly excluding exculpatory evidence, insufficient evidence supports one of the counts of conviction, and the court abused its discretion when sentencing her to consecutive terms. We disagree and will affirm.

## FACTS AND PROCEEDINGS

*Background, Physical Abuse, and General Sexual Conduct*

Defendant and husband B.L. had two sons, C.L., and Br.L. K.S. was defendant's half-brother and was 15 days older than his nephew, C.L. Defendant later married husband R.L., and they had two sons, Bo.L and G.L., and a daughter.

Br.L., C.L., and Bo.L. each testified that their household growing up was violent and chaotic and they were subject to physical abuse by defendant. They testified to being slapped and punched in the face, choked, smothered in piles of laundry, and spanked. When C.L. was in fifth grade, he reported to the school principal that defendant had held Br.L.'s head down in a pile of clothes on the couch until he could not breathe and stopped kicking; she then let him go, and he gasped for air. The police were called, and the children were taken away from home for a weekend; the physical abuse became worse after they returned.

C.L., Br.L., Bo.L., and K.S. also testified that defendant routinely walked around the house fully naked but engaged in normal household activities while the boys were in elementary school. She would also regularly call K.S., Br.L., and Bo.L. into the bathroom while she was showering, and she would leave the shower curtain open so the boys could see her lathering herself with soap and shaving her legs and pubic area. Br.L. testified that some of the conversations they had were "weird and sexual" while others were normal. K.S. testified that defendant continued to shower in front of him until he was in high school and that the topics of their conversations were not always unusual, but the "duration and the silence that would sometimes follow the conversation was unusual." Bo.L. testified that the last time defendant showered in front of him, he was 16

2

years old.  Br.L. grew up thinking the behavior was normal; defendant was open with her sexuality and wanted her children to be, too.

*Br.L.'s Allegations*

Br.L., C.L., Bo.L., and K.S. each testified about incidents of sexual abuse.[1]  Br.L. testified that between the age of six and 12 he showered naked with defendant, and she would often wrap her arms or body around him, touch and rub his genitals and buttocks, and make lewd comments about his genitals.

Br.L. also testified that defendant took naps with the boys while naked, both as a group and individually; she would wrap her legs around them, rub her genitals and body on them, blow on his genitals in the manner of giving someone a "raspberry," and have them blow on various parts of her body.

Defendant last touched Br.L. sexually when he was about 13 years old.  He did not tell anyone about the sexual abuse, including a family mediator who interviewed him related to a custody dispute in 2012.  He was sexually attracted to defendant, which he did not want to admit to his brothers, and which confused him.  He was also afraid that defendant would hurt him.

*C.L.'s Allegations*

C.L. testified that defendant would lie in bed with him during "nap time" or "cuddle time" when he was between six and 12 years old.  She would be naked, and he would be naked sometimes and wearing underwear other times.  When he was six to eight years old, she rubbed her genitals against the side of his body or his leg between five and 20 times.

The touchings were more frequent and extensive between ages nine and 11.  She rubbed her genitals against him during nap times, directed him to touch her genitals,

---

[1]  G.L. also testified and denied any inappropriate sexual contact.

occasionally inserted her finger into his anus while touching his genitals, and put her mouth on his penis. She unsuccessfully attempted to have sex with him two or three times when he was 11 years old.

C.L. did not tell the school principal about defendant's sexual abuse at the time he reported that she had smothered Br.L. in a pile of laundry, nor did he disclose the abuse to a family mediator in 2012 despite having had the opportunity. He testified that defendant told him these things were normal, and he did not understand that her sexual behavior toward him was not normal. She also told him that she would beat him, and no one would believe him if he told anyone.

*Bo.L.'s Allegations*

Bo.L. testified that when he was between the ages of four and seven, he and defendant had "naked cuddle buddy time," in which they wore only shirts and cuddled and "spoon[ed]." Defendant pushed her genital area against him and might have moved back and forth. When he was 11 years old, defendant massaged his buttocks and inner thigh.

*K.S.'s Allegation*

While in elementary school, K.S. often went to defendant's house after school; she was like his own mother. Despite the nature of their relationship, watching defendant shower caused K.S. to be physically attracted to her. He testified about a time when he was seven years old, where he made eye contact with defendant and told her that he was going to the bathroom, even though he really did not need to urinate. She asked K.S. if he needed help, and he told her that he did. By saying yes, K.S. knew that defendant would touch his penis, and he wanted her to do so. Defendant had helped him use the bathroom "[y]ears before that," but by the time of the incident, she had not helped him use the bathroom "for years." They went to the bathroom, and defendant stood behind him, pulled his pants down, held his penis with her thumb and index finger and extended the tip of his penis "outside of the core of the genitalia." She put the rest of her hand

4

around his testicles.  She held his penis for about 10 to 15 seconds before asking if he was done.  K.S. said yes, even though he had not urinated, and they washed their hands and left the bathroom.  When defendant touched his penis that day, it was not the same way she would touch him when he was younger to help him go to the bathroom.[2]  On cross-examination, K.S. agreed that it is "not unusual for a mother or a woman in that role to come in and make sure the boy isn't peeing all over the bathroom."

K.S. tried his best to tell N.B.--who was K.S.'s and defendant's mother--about the incident several months after it occurred, but he did not know how to describe it.  Despite being a nurse and mandated reporter, N.B. did not report the incident.[3]  About a year later, K.S. tried to tell his father what had occurred.  K.S. testified that he couldn't "say whether or not [his father] did or didn't understand" what he was trying to tell him, although K.S. acknowledged he did not articulate his allegation to the degree he did at trial.

When K.S. was 10 years old, he was the subject of a custody dispute between his father and N.B.; defendant called child protective services (CPS) to report concerns for his well-being.  When interviewed, K.S. did not tell the social worker or a police officer that defendant sexually abused him.  Nor did he tell a counselor he saw around that time.[4]  K.S. stopped going to defendant's house with any regularity because N.B. was upset with defendant over her report.

---

[2]  On appeal, defendant claims there is insufficient evidence to support the jury's guilty verdict as to this incident, which was charged as count 15.  We address defendant's claim in the Discussion, *post*.

[3]  N.B. testified that K.S. never told her defendant touched him inappropriately.

[4]  When asked on cross-examination why he did not tell any counselor about defendant's abuse, K.S. replied, "My mother had told me that she was and is a registered nurse, and she had worked in counseling, and I had told her."

*Subsequent Events and Disclosure of the Abuse*

In December 2016, defendant informed Bo.L.'s school that he was selling her medication at school, leading to Bo.L.'s withdrawal from school for the semester.[5] Bo.L. had wanted to emancipate from defendant's parental authority "[f]or years," and he asked C.L. for help. Bo.L. spoke to C.L. and Br.L. about defendant's sexual abuse, and C.L. advised him to talk to family therapist Lisa Larson about the abuse. In August 2017, Bo.L. told Larson that defendant cuddled with him naked from 2004 to 2007. Bo.L. testified that he was apprehensive about disclosing the abuse because he was still living in defendant's home, and he feared that she would punish him if he disclosed. After disclosing to Larson, Bo.L. testified that he was required to stay in his room for three days, and defendant instructed him to "rethink" his allegations.[6] After two days, defendant, R.L., and Bo.L. went back to see Larson, and Bo.L. was instructed to remain quiet about the abuse.

Also in August 2017, and against Bo.L.'s wishes, C.L. told N.B. about Bo.L.'s allegation of sexual abuse. Bo.L. testified that his parents routinely went through his phone and would have known if he were discussing defendant's abuse, and he did not believe N.B. had his best interest at heart and did not think she would help him. Around Thanksgiving in 2017, Bo.L. left defendant's house and went to live with his grandparents.

---

[5] Bo.L. testified that he was "invited to leave and not expelled," and that he was dis-enrolled, but it "got seen as" an expulsion.

[6] Bo.L. testified that Larson did not report the abuse allegation to CPS. He testified, "[Larson's] words were quote, my mother may not have known sexual boundaries, and she knew I was still in the home, and it would not be my benefit coming out about this. And that's why she didn't make a report, which is obviously not professional." He testified to his belief that Larson did later make a report to CPS.

On May 24, 2018, Br.L., Bo.L., and K.S. met at Br.L.'s apartment in Los Angeles, where he was living while enrolled at the University of Southern California (USC). K.S. disclosed that he had been molested by defendant, and over the next few days he "became more and more out of his mind" before he left the apartment. Bo.L. called K.S.'s parents, who came to Los Angeles to find him. Bo.L. testified that K.S. was "living on the streets or something."[7] Br.L. and Bo.L. then told Bo.L.'s paternal grandfather about defendant's abuse.[8] Bo.L.'s grandfather reported Br.L.'s and Bo.L.'s allegations to law enforcement, and officers then interviewed Br.L., Bo.L., C.L., K.S., G.L., and defendant's daughter.

*Procedural History*

The third amended information, which was the operative charging document, charged defendant with 15 counts of committing a lewd and lascivious act with a child under the age of 14 years old (Pen. Code, § 288, subd. (a)), as follows: count 1, against Br.L.; counts 2 and 3 against Bo.L.; counts 4 through 11 against C.L.; counts 12 through 14 against G.L.; and count 15 against K.S. The information alleged that defendant committed offenses against more than one victim. (*Id.* §§ 1203.066, subd. (a)(7); 667.61, subds. (e)(4), (j)(2).) Defendant pleaded not guilty and denied the allegation.

A jury found defendant guilty on counts 1 (rubbing Br.L.'s genitals while saying his penis was big when he was seven years old), 2 (rubbing her genitals on Bo.L.'s buttocks when he was between four and six years old), 4 (dry humping C.L. during naptime when he was between six and 11 years old), and 15 (rubbing K.S.'s penis while in the bathroom when he was seven years old). The jury found defendant not guilty on

---

[7] Defendant claims the trial court abused its discretion by excluding evidence of K.S.'s mental illness diagnoses. We discuss the relevant factual and procedural background of that claim in greater detail in the Discussion, *post*.

[8] Br.L. testified that they disclosed the abuse to Bo.L.'s paternal grandfather because "[h]e seemed like the most normal person in our entire family."

counts 3 and 12 through 14, and it failed to reach verdicts as to counts 5 through 11.[9] The jury found the multiple-victim allegation true. The trial court sentenced defendant to four consecutive terms of 15 years to life in prison.[10]

Defendant timely appealed. The case was fully briefed in March 2023 and was assigned to the current panel on March 30, 2023. Defendant requested oral argument and the case was heard on August 28, 2023.

## DISCUSSION

### I

### *Evidentiary Claims*

Defendant claims the trial court made numerous evidentiary errors by excluding exculpatory evidence that deprived her of her constitutional rights to due process, a fair trial, confrontation, and to present a defense. (U.S. Const., 5th, 6th, 14th Amends.) We will consider defendant's claims of error in turn, and we conclude each lacks merit.

A. *Legal Background*

"Whether rooted directly in the Due Process Clause of the Fourteenth Amendment, [citation], or in the Compulsory Process or Confrontation clauses of the Sixth Amendment, [citations], the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.' " (*Crane v. Kentucky* (1986) 476 U.S. 683, 690.) "The Sixth Amendment to the [federal] Constitution guarantees the right of an accused in a criminal prosecution 'to be confronted with the witnesses against him.'

---

[9] The trial court declared a mistrial as to counts 5 through 11 and granted the prosecution's motion to dismiss those counts at sentencing.

[10] Defendant was sentenced under the version of Penal Code section 667.61 in effect at the time of her crimes, which predated a 2010 amendment to the statute that would have required the court to impose sentences of 25 years to life had defendant's crimes been committed after the statutory amendment. (Compare *id.*, § 667.61, former subd. (b), Stats. 2006, ch. 337, § 33; with *id.* § 667.61, former subd. (b), Stats. 2010, ch. 219, § 16.)

This right is secured for defendants in state as well as federal criminal proceedings . . . . [¶] . . . [¶] Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested. Subject always to the broad discretion of a trial judge to preclude repetitive and unduly harassing interrogation, the cross-examiner is not only permitted to delve into the witness' story to test the witness' perceptions and memory, but the cross-examiner has traditionally been allowed to impeach, *i.e.*, discredit, the witness." (*Davis v. Alaska* (1974) 415 U.S. 308, 315-316.)

Evidence must be relevant to be admissible. (Evid. Code, § 350.)[11] " 'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (§ 210.) "Evidence is relevant when no matter how weak it is it tends to prove a disputed issue." (*In re Romero C.* (1995) 33 Cal.App.4th 1838, 1843.) "We apply the deferential abuse of discretion standard when reviewing a trial court's ruling on a relevance objection." (*People v. Panah* (2005) 35 Cal.4th 395, 474.)

The California Evidence Code provides that evidence bearing on a witness's credibility is generally relevant and admissible. (§§ 210, 350.) Nevertheless, under section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." " ' " 'Evidence is not prejudicial, as that term is used in a section 352 context, merely because it undermines the opponent's position or shores up that of the proponent. The ability to do so is what makes evidence relevant. The code speaks in terms of *undue* prejudice. Unless the dangers of undue prejudice, confusion, or

---

[11] Further undesignated statutory references are to the Evidence Code.

time consumption ' "substantially outweigh" ' the probative value of relevant evidence, a section 352 objection should fail. [Citation.] ' "The 'prejudice' referred to in [the statute] applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues. In applying section 352, 'prejudicial' is not synonymous with 'damaging.' " [Citation.]' [Citation.] [¶] The prejudice that [the statute] ' "is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence." [Citations.] "Rather, the statute uses the word in its etymological sense of 'prejudging' a person or cause on the basis of extraneous factors. [Citation.]" [Citation.]' [Citation.] In other words, evidence should be excluded as unduly prejudicial when it is of such nature as to inflame the emotions of the jury, motivating them to use the information, not to logically evaluate the point upon which it is relevant, but to reward or punish one side because of the jurors' emotional reaction. In such a circumstance, the evidence is unduly prejudicial because of the substantial likelihood the jury will use it for an illegitimate purpose." ' " (*People v. Scott* (2011) 52 Cal.4th 452, 490-491.)

"[T]he trial court enjoys broad discretion in assessing whether the probative value of particular evidence is outweighed by concerns of undue prejudice, confusion or consumption of time." (*People v. Rodrigues* (1994) 8 Cal.4th 1060, 1124.) Accordingly, the court's exercise of its discretion pursuant to section 352 to exclude evidence will not be reversed on appeal, absent a showing that the court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice. (*Ibid*.) "[E]xclusion of evidence that produces only speculative inferences is not an abuse of discretion." (*People v. Babbitt* (1988) 45 Cal.3d 660, 684.) Finally, a defendant's right to due process does not deprive a trial court of its " 'wide latitude' to exclude evidence that is 'repetitive . . . , only marginally relevant' or poses an undue risk of 'harassment, prejudice, [or] confusion of the issues.' " (*Crane v. Kentucky*, *supra*, 476 U.S. at pp. 689-690 ["[W]e have never questioned the power of States to exclude

10

evidence through the application of evidentiary rules that themselves serve the interests of fairness and reliability -- even if the defendant would prefer to see that evidence admitted"], *id*. at p. 690.)

B.  *YouTube Video*

Defendant challenges the trial court's exclusion of evidence related to a YouTube music video C.L. and K.S. watched as teenagers, which discussed making false sexual abuse allegations in order to "get a new daddy."

1.  *Background*

The People moved in limine to exclude evidence related to the song "Get a New Daddy" by the comedy group The Whitest Kids U Know, which C.L. had purportedly posted on his Facebook page in May 2015.[12]  The prosecutor argued that the Facebook

---

[12]  The lyrics, which were attached to the prosecution's trial brief, are in pertinent part as follows:

"Hey there kids, I see you're feelin' blue
Parents push you around and tell you what to do
Dad makes you clean your room and go to bed
Instead of watch TV you have to do homework instead
And I know it makes you angry and you're full of rage
Well let me tell you a secret I wish I knew at your age
Next time you're angry and you wanna to fight back
Just tell your teacher Daddy likes to play with your sack
And you can get a new daddy
Get a new daddy
Police will take the old one away in a Caddy
You can get a new daddy
Get a new daddy
Stay up real late, kick back, and light up a fatty
You can get a new daddy
Get a new daddy
In a couple of months you'll probably get a new daddy
Get a new daddy
Get a new daddy
In a couple of months you'll probably get a new daddy
Now for a little while your new daddys cool

post was remote in time, and the song lyrics referenced acts that were not part of the allegations in this case.

Defense counsel argued in opposition to the motion that K.S. and C.L. listened to the song 10 to 15 times when they were between 13 and 15 years old, around 2009 or 2010, they attended the comedy group's show with K.S.'s father, and C.L. posted a picture as a memory from the show on his Facebook page in 2015.[13] Noting that the song contained instructions on how to get parents arrested for child molestation so that the parents "go away," counsel explained that the video taught C.L. how he could help Bo.L. emancipate by making false sexual abuse allegations against his mother (defendant).

---

Buys you things and tries real hard to bond with you
Lets you eat candy and play video games
But your friends at school all think that he's kind of lame
Now you can't have your buddies makin fun of your dad
And all in all this one is really not so bad
But you think you might like to try once more
Take naked Polaroids of yourself and leave them in his sock drawer
And you can get a new daddy
Get a new daddy
Stay up real late, kick back, and light up a fatty."

The following verse states in part:

"Now your moms wonderin whats wrong with her
And why she keeps attractin men that are dirty pervs
She has a breakdown and crys and crys
And after a while shes institutionalized
And you can get a new mommy."

[13] Counsel initially represented that the boys watched the video "incessantly" and "very frequently," before acknowledging that a family member would testify that she watched the video with C.L. 10 to 15 times in 2009 or 2010. No evidence suggested that the song at issue here was played at the comedy show C.L. and K.S. attended.

The trial court granted the People's motion. The court recognized that the evidence would not consume an undue amount of time or confuse the issues but concluded the probative value of the evidence was substantially outweighed by its prejudicial effect. The court found the probative value of the evidence to be "fairly low" due to the length of time between when C.L. and K.S. viewed the video (2009 or 2010) and when Bo.L. reported defendant's sexual abuse to Larson in August 2017 and Bo.L. and Br.L. reported the abuse to Bo.L.'s paternal grandfather in May 2018, the number of times C.L. and K.S. watched the video (10 to 15), and the only general similarity between the song's lyrics and the allegations in this case.[14] The court emphasized that, other than C.L. sharing a memory of the show in 2015 as something he used to think was funny, the defense could not show any connection between the song and the allegations in the case.

The court then concluded that the video was "shockingly prejudicial," noting: "This is the type of evidence I think that [section] 352 is really designed for. In a child molest case, to show a video like this when you don't have any evidence to connect it is the kind of thing that could override the reason of a juror sitting there. It's pretty bad. I share all of [the prosecutor's] concerns about that video."

During trial, at a break in the defense's cross-examination of K.S., trial counsel renewed her request to introduce the evidence during C.L.'s testimony. The court denied the motion; it reiterated that there was no evidence connecting a video C.L. and K.S. watched as children to them alleging sexual abuse nearly a decade later. The court then denied counsel's request to question C.L. and K.S. outside the presence of the jury to

---

[14] In her reply brief, defendant observes that one verse of the song discusses how to "Get a New Mommy." However, the song's lyrics regarding how to "get a new mommy" were related to the mother suffering from a breakdown caused by her reaction to the father's alleged acts, not because the children alleged that the mother had committed any kind of sexual abuse.

"clear [] up" how many times they watched the video; the court concluded there was no basis to conduct a hearing.

### 2. *Probative Value*

Defendant raises three arguments related to the trial court's ruling. She contends the court failed to appreciate the probative value of the evidence, failed to identify any cognizable prejudice from the evidence within the meaning of section 352, and erroneously refused to allow her to lay further foundation for the admissibility of the evidence through testimony of C.L. and K.S. We address defendant's arguments in turn.

As defendant correctly observes, the trial court recognized the relevance of the evidence to the defense theory: C.L. and K.S.'s repeated viewing of the video informed them of the strategy to "get a new parent" by fabricating sexual abuse allegations against her. But she argues the court improperly contrasted C.L. and K.S.'s passive watching of a YouTube video with a wife actively searching for information about poisoning her husband, and the husband dying of poisoning a short time later. She argues C.L. and K.S. actively sought out the video by calling it up on YouTube, and the frequency with which they watched the video demonstrated their ongoing interest in the video and its contents.

The trial court stated during the parties' argument that the evidence's relevance was fact driven. It noted that evidence of a wife's search for information on how to poison her husband would be "really relevant" if her husband died of poisoning a short time later. But it noted that "passively listening and laughing" at a song from a comedy group was not the same as actively typing a query into an Internet search engine. Defense counsel disagreed; she stated: "I don't think it's quite as passive as the Court is describing," and the court then agreed with counsel that the boys "must have thought it was funny" to watch it that often. Thus, while we agree the court initially drew the distinction defendant complains of here, the court also later accepted that the distinction was not valid. Moreover, the court's ruling was based on the length of time between C.L. and K.S. watching the video and Bo.L.'s report of sexual abuse (which C.L. encouraged),

14

and on the differences between the conduct described in the video and the allegations in this case, not on whether C.L. and K.S. had actively or passively watched the video.

Defendant next contends that the evidence should not have been excluded on the basis that it was remote in time because at the time of Bo.L.'s August 2017 disclosure, C.L. demonstrated an ongoing interest in the comedy group that produced the video. But an ongoing interest in the comedy group that produced the video is not the same as an ongoing interest in the song at issue here, and there was no evidence that C.L. continued to have any interest in that *song*. Assuming that in 2015 C.L. did in fact post to his Facebook page a photograph from the comedy show he attended with K.S. and K.S.'s father, there was no evidence that the song was played at the show, and there was no evidence beyond mere speculation that C.L. or K.S. considered the song to be a "template" they used years later to fabricate sexual abuse allegations against defendant. Defendant asserts that C.L. was employing the strategy he learned from the song because he sent a text message to Bo.L. saying that he was "trying to get [Bo.L.] a way out" in the context of advising Bo.L. to contact N.B. and disclose that he had been abused. But there was no evidence C.L. referred to the song that he had found funny years before when providing this advice to Bo.L., or that he had learned a strategy of false reporting from the song and had been waiting nearly a decade to employ the strategy. The court did not abuse its discretion by concluding that C.L. and K.S.'s exposure to the song was too attenuated from their reports of abuse and too dissimilar to the allegations in the case to have any significant probative value.

Defendant relies on three cases to support her position that a victim testifying at trial may be impeached by evidence that he learned about a strategy for falsely reporting sexual abuse, but each case is readily distinguishable. In *People v. Daggett* (1990) 225 Cal.App.3d 751, the appellate court concluded that the trial court improperly refused to allow the defendant to introduce evidence that the victim had been previously molested by older children. The court recognized that a child's testimony in a molestation case

15

"can be given an aura of veracity by his accurate description of the acts" "because knowledge of such acts may be unexpected in a child who has not been subjected to them." (*Id.* at p. 757.) Thus, if the child were subjected to similar acts by others, it might cast doubt on the inference that the child must have learned of the acts through the defendant. (*Ibid.*)

Defendant alleges that the evidence was probative because it provided evidence of how C.L. and K.S. learned of a strategy for "gain[ing] personal advantages at the expense of their mother." But the evidence in *Daggett* was admissible to show how the child could accurately describe something a child their age would normally know nothing about. There is nothing to suggest that the victims had only become aware of the alleged acts by watching the video. The video discussed falsely alleging that a father "likes to play with your sack" and leaving nude pictures in the father's sock drawer. While K.S.'s allegation in this case did involve defendant (not the father) cupping his testicles, the other allegations in this case were substantially different from the acts mentioned in the video. Moreover, there is little to suggest that C.L. had only learned the strategy of reporting sexual abuse from the video; he had previously reported to a school principal that defendant had smothered Br.L. in a pile of laundry, so he had experience reporting conduct he perceived as wrong.

In *People v. Adams* (1988) 198 Cal.App.3d 10, a rape conviction was reversed because the trial court excluded evidence that the victim had previously made false accusations of rape, which affected her credibility. (*Id.* at p. 19.) Defendant contends *Adams* is analogous because in both cases, the evidence was relevant to show the alleged victim had learned the value of making false allegations of sexual abuse to further a goal. But the relevance of the evidence in *Adams* was not that the alleged victim was aware of the value of falsely reporting rape, but rather that she *had previously made* false allegations, which affected her credibility. Defendant did not intend to introduce

16

evidence of the song here to show that C.L. and K.S. had previously falsely reported abuse. *Adams* is inapposite.

In *People v. Moore* (2016) 6 Cal.App.5th 73, also cited by defendant, Moore was convicted of murder after planting a homemade bomb that the victim inadvertently detonated. Moore argued that the trial court abused its discretion by admitting evidence that he had made other bombs 20 years earlier because the evidence was too remote in time to be probative. The appellate court concluded that the evidence was relevant to his experience with creating explosions, and the risk of prejudice was low. (*Id.* at p. 94.) Here, defendant contends that she was entitled to present evidence that the victims had previously learned of the strategy of making false allegations of sexual abuse. But again, the evidence in *Moore* was relevant to show that the defendant *had experience making bombs*, not that Moore, for example, had watched a satirical video about making bombs years earlier. Here, defendant did not intend to introduce the evidence to show that C.L. and K.S. had experience falsely reporting sexual abuse, which would have been more closely analogous to the evidence at issue in *Moore*.

### 3. *Prejudicial Effect*

Defendant contends the evidence was not intended to vilify C.L. and K.S. or to portray them as bad people, and the trial court misunderstood the type of prejudice that could result in evidence being excluded under section 352.

"[W]hen ruling on a section 352 motion, a trial court need not expressly weigh prejudice against probative value, or even expressly state it has done so. All that is required is that the record demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352." (*People v. Williams* (1997) 16 Cal.4th 153, 213 (*Williams*).) Here, the trial court balanced the minimal probative value of the evidence against the prejudicial effect of the evidence. While defendant claims there is no prejudicial effect, we observe that the evidence suggests, without providing any substantial connection to the allegations in this case, that C.L. and K.S. found a ribald

17

and profanity-laced song about fabricating sexual abuse allegations about their father, and consequently driving their mother insane, to be funny. We do not conclude that the evidence would have been properly excluded had the evidence been more than minimally probative, but the ruling to exclude the evidence was not an abuse of discretion given the evidence before the trial court at the time of its ruling, which showed only a speculative and unsupported connection between two of the four victims' (C.L. and K.S.) viewing of the video years before the reports of abuse were first made to Larson by Bo.L. and to Bo.L.'s paternal grandfather by Br.L. and Bo.L., neither of whom was alleged to have *ever* seen the video.

4. *Refusing to Allow Defendant to Lay Foundation for the Video*

Defendant contends the trial court improperly refused to permit her to question K.S. and C.L. about how many times they had watched the video, which she contends constituted a request to make an offer of proof under section 354.

"Where the trial court is considering a ruling or has made a ruling that certain evidence is inadmissible, the party offering the evidence may make an 'offer of proof' to explain its "substance, purpose, and relevance.' " (*In re A.G.* (2020) 58 Cal.App.5th 973, 996, quoting § 354, subd. (a).) "The ' "*evidence*" ' in an offer of proof shall consist of ' "testimony, writings, material objects, or other things presented to the senses." ' " (*In re A.G.*, at p. 996.) An offer of proof must be specific in indicating the purpose of the testimony, the name of the witness, and the content of the answer to be elicited. (*Ibid.*) " ' "The judge may properly reject a general or vague offer which does not indicate with precision the evidence to be presented and the witnesses who are to give it." ' " (*Ibid.*) "A 'vague and nebulous' offer of proof as to what testimony would be elicited from the witness is not sufficient." (*Id.* at p. 997.)

Defendant's request to question K.S. and C.L. was a request to conduct a foundational hearing under section 402, which authorizes a court to hold a hearing on "foundational and other preliminary facts" "out of the presence or hearing of the jury."

18

Defendant intended to ascertain how many times K.S. and C.L. had watched the video, and based on their answers to that question, to potentially provide the court with an offer of proof to explain the evidence's relevance. A decision not to hold a section 402 hearing is reviewed for an abuse of discretion. (*Williams*, *supra*, 16 Cal.4th at p. 197; *People v. Chavez* (2018) 22 Cal.App.5th 663, 703 [no requirement that a court conduct a section 402 hearing before exercising discretion under section 352].)[15]

We conclude that the trial court's decision to not hold a section 402 hearing was not an abuse of discretion. The parties previously litigated the issue extensively, and the court made an informed ruling based on the parties' offers of proof and arguments regarding admissibility. The court concluded that defendant failed to demonstrate how evidence of a video that C.L. and K.S. watched when they were between 13 and 15 years old, which bore only a general similarity to the allegations in this case, was relevant to their reporting sexual abuse nearly a decade later. Defendant's request to question C.L. and K.S. did not suggest an intent to elicit testimony that either of the men had viewed the video more recently than 2009 or 2010, and nothing suggests that the inquiry would show any greater similarity between the conduct described in the song and the allegations in this case. Thus, even if C.L. and K.S. had testified to watching the videos more than 10 to 15 times, that additional information would not have affected the court's reasons for excluding the evidence.

---

[15] Defendant contends that we must review this issue de novo because the trial court's decision to not hold a hearing was a rejection of her offer of proof. But defendant's request to hold a hearing was not itself an offer of proof that the court refused to consider. Rather, as we have discussed, defendant requested a foundational hearing to elicit additional information from which to make an offer of proof.

## C. *C.L.'s Mental Health Diagnosis*

Defendant next contends the trial court improperly excluded evidence that C.L. was diagnosed with bipolar disorder and that he suffered from delusions at age 11, which she argues was relevant evidence bearing on his credibility.

### 1. *Background*

Defendant moved in limine to admit expert testimony that C.L. was diagnosed with bipolar disorder, which she argued can cause delusions, affect memory, and "impact the reliability of allegations." She also sought to elicit testimony from R.L. that C.L. suffered from two delusions at age 11, which overlapped with the time period he alleged the sexual abuse occurred. Specifically, R.L. would testify that C.L. did not want to go into his house because he believed the roof was going to collapse, and he once believed his drink had been poisoned. Defendant and R.L. took C.L. to the hospital, and he was hospitalized at a psychological facility a few months later. C.L. did not mention that he had been sexually abused at that time. Counsel speculated that C.L. could have had another delusion that his mother sexually abused him, but that he had forgotten about it "for eight or nine years, however long." Counsel recalled seeing in C.L.'s records that a psychologist or psychiatrist had noted C.L.'s delusions, but she could not locate the record. Accordingly, she acknowledged that her proposed expert witness (C.L.'s treating physician) would not testify that C.L. was delusional, and that R.L., who would testify about the delusions, was neither a psychiatrist nor a psychologist. The prosecutor argued that the evidence should be excluded under section 352.

The trial court excluded the evidence as irrelevant because there was no nexus between the mental health diagnosis and the ability to tell the truth, and C.L.'s purported delusions were not relevant to the issue of whether he fabricated abuse allegations years later. To the extent the evidence was relevant, the court noted it would exclude the evidence under section 352 because the minimal probative value of the evidence was substantially outweighed by the potential prejudice of introducing evidence of a witness's

20

mental illness, and the evidence would consume an undue amount of time and would confuse and mislead the jury.

Defendant subsequently argued that a diagnosis of bipolar disorder can affect a person's ability to accurately perceive reality, and therefore the memory C.L. later retrieved as an adult might have been affected by his compromised ability to perceive reality at the time of the alleged abuse. The trial court reiterated that no evidence suggested C.L. fabricated the sexual abuse allegations as an adult because he suffered from mental health issues as a child, and defendant's argument amounted to speculation that C.L.'s mental illness *might* have caused him to misperceive the abuse.

### 2. *Applicable Law*

Section 780 provides that the jury "may consider in determining the credibility of a witness any matter that has any tendency in reason to prove or disprove the truthfulness of his testimony at the hearing," including the extent of the witness's "capacity to perceive, to recollect, or to communicate any matter about which [she] testifies" (*id.*, subd. (c)), or the witness's "opportunity to perceive any matter about which [she] testifies" (*id.*, subd. (d)). Accordingly, "[a] witness may be cross-examined about her mental condition or emotional stability to the extent it may affect her powers of perception, memory or recollection, or communication," and " '[e]xpert psychiatric testimony may be admissible to impeach the credibility of a prosecution witness where the witness' mental or emotional condition may affect the ability of the witness to tell the truth.' " (*People v. Herring* (1993) 20 Cal.App.4th 1066, 1072 (*Herring*).)

However, while a witness's mental health may be relevant to his credibility, such evidence is not automatically admissible. (*People v. Anderson* (2001) 25 Cal.4th 543, 579 (*Anderson*).) Our Supreme Court has explained, " '[t]he mental illness or emotional instability of a witness can be relevant on the issue of credibility, and a witness may be cross-examined on that subject, *if* such illness affects the witness's ability to perceive, recall or describe the events in question.' " (*People v. Samuels* (2005) 36 Cal.4th 96,

116, italics added.) Thus, a trial court may properly exclude evidence of a witness's mental illness if there is no showing it affects their powers of perception, communication, memory, or recollection. (*Herring*, *supra*, 20 Cal.App.4th at p. 1072.)

Indeed, " '[t]he use of psychiatric testimony to impeach a witness is generally disfavored.' " (*Anderson*, *supra*, 25 Cal.4th at p. 575.) "It is a fact of modern life that many people experience emotional problems, undergo therapy, and take medications for their conditions. 'A person's credibility is not in question merely because he or she is receiving treatment for a mental health problem.' " (*Id*. at p. 579.) In *Anderson*, our Supreme Court held that the trial court properly sustained a relevancy objection when defense counsel asked a witness, who was sometimes delusional, if she was in therapy. (*Id*. at pp. 570-571, 578-579.) The court concluded: "Even if examination of a witness about treatment for mental illness might sometimes be relevant, here evidence that [the witness] had received therapy would have added little to the specific evidence, largely undisputed, that she had significant fantasies. Defense counsel was allowed to cross-examine [the witness] fully about the specific delusions that might impair the accuracy of her testimony. Nothing more was necessary." (*Id*. at p. 579.)

### 3. *Analysis*

Defendant argues the trial court's ruling was an abuse of discretion because it failed to appreciate the logical connection between certain types of mental illness and impaired credibility, and because C.L.'s mental illness might have caused him to develop the delusional belief that defendant sexually abused him.

We conclude the trial court's decision to exclude evidence of C.L.'s mental health diagnosis was not an abuse of discretion because defendant failed to make any showing that C.L.'s bipolar diagnosis affected his powers of perception, communication, memory, or recollection as it related to the allegations of sexual assault in this case. (*Herring*, *supra*, 20 Cal.App.4th at p. 1072; *Anderson*, *supra*, 25 Cal.4th at p. 579.) There were no medical records describing or classifying C.L. as delusional. But even assuming the

delusions alleged could be proven, the evidence of delusions specifically related to the roof caving in and a poisoned drink, not to any delusion related to sexual abuse. There was no evidence that C.L.'s ability to perceive the events leading to his allegations of sexual abuse was impaired in any way. Defendant's assertion that C.L. might have developed a delusion related to sexual abuse is entirely speculative. Finally, there was no evidence that C.L.'s delusions, if any, effected his ability to accurately recall or describe the events at trial. Accordingly, the trial court did not abuse its discretion by concluding that defendant failed to establish the necessary link between C.L.'s mental health diagnosis and (1) his ability to perceive the events that occurred when he was younger, or (2) his ability to accurately recall or describe the events at trial. (*People v. Samuels*, *supra*, 36 Cal.4th at p. 116.)

D. *Evidence of K.S.'s Mental Illness*

Defendant contends the trial court improperly excluded evidence that K.S. was diagnosed with schizophrenia and was in a psychotic state at the time he first disclosed defendant's sexual abuse.

1. *Background*

Defendant moved in limine to admit evidence that K.S. suffered a psychotic episode while visiting Br.L. and Bo.L. in Los Angeles in May 2018, as we recounted *ante*, and was subject to an involuntary hold. (Welf. & Inst. Code, § 5150.) She noted that the psychiatric hold stated K.S. "was in the street contemplating harming himself secondary to flashbacks about being sexually abused as a child," and he "states there is a lot of family stuff going on." K.S.'s medical records reflected that K.S. said he had been raped by his sister and cousin. The court recognized that K.S.'s allegation of "rape" as reflected in the medical record was inconsistent with his subsequent allegation of molest as charged in this case, but it noted that no one had determined that K.S.'s initial disclosure was the subject of a delusion or was untrue. Additionally, while K.S. had self-reported as delusional, the medical records did not reflect that a medical professional had

23

found him to be delusional at that time. Counsel represented that K.S.'s symptoms could affect his ability to perceive reality and the reliability of any claim he made about his sister sexually abusing him, although counsel acknowledged she did not have a report from an expert witness who would testify to that.

The prosecutor argued that the evidence should be excluded because K.S.'s mental health issues were irrelevant to his credibility, and the evidence was highly prejudicial and misleading.

The court denied defendant's motion to admit the evidence. It concluded that K.S.'s description of himself as delusional and confused in 2018 was not probative of his ability to tell the truth at trial about the alleged abuse that occurred years earlier. The court further determined that any slight probative value of the evidence was substantially outweighed by the probability that its admission would necessitate undue consumption of time, create substantial danger of undue prejudice, confuse the issues, and mislead the jury. The court clarified that K.S.'s statement that he was raped by his sister would be admissible as impeachment evidence if K.S. denied that he had made such a statement.

At trial, K.S. testified that he was hospitalized in 2018, and he acknowledged that a medical record from that hospitalization reflected that he told a doctor his sister had touched him when he was seven years old and had raped him when he was 13 years old. But K.S. denied that he told a doctor that his sister had raped him, which he defined specifically as "penetration." He clarified: "[T]he statement that . . . I was raped by [defendant] is categorically false."

The trial court subsequently held a section 402 hearing at which defense expert Dr. William O'Donohue testified concerning the proffered evidence. Dr. O'Donohue testified that a person suffering from a serious mental illness such as psychosis or schizophrenia and experiencing delusions is more likely to make a false allegation of sexual abuse due to his or her impaired cognitive capacity to grasp reality. While medication can create "some distance from the [delusional] belief," in most cases the

24

delusional individual still holds the belief. Thus, in evaluating whether a sexual abuse allegation is the subject of a delusion, one must look at the presentation of the allegation to determine its plausibility. A claim is more plausible if it is corroborated, and the alleged victim provides plausible details about the abuse. Dr. O'Donohue opined that K.S. did not provide many details of the alleged abuse, females are less likely to be abusers, mothers rarely abuse their biological children, urination was not commonly regarded as a "sexy event[]," the abuse occurred only once despite defendant's recurring access to K.S., and other people might have given him suggestive ideas. Dr. O'Donohue agreed that plausible details about the event would decrease the possibility that the alleged abuse was a delusion, and the allegation would be more plausible if there were no urination involved, and the bathroom just happened to be where the touching occurred-- provided there were plausible reasons for being in the bathroom.

The trial court excluded the evidence as irrelevant. In doing so, the court applied the analysis testified to by Dr. O'Donohue and considered whether it could rule out that the incident was the product of a delusion by determining whether the facts related to the incident were plausible. The court concluded there was nothing implausible about the allegation.[16] The court noted that C.L., Bo.L., and Br.L. corroborated K.S.'s testimony regarding defendant's conduct at home and her interest in young boys. Aside from using the word "rape" in the hospital, K.S. consistently described the alleged abuse with significant detail. K.S. did not allege multiple acts of molest or otherwise appear to be exaggerating. The court discounted Dr. O'Donohue's testimony that women are less likely to commit sexual abuse than men, and it noted that the defense intended to call a witness to testify about the malleability of witnesses.

---

[16] The court recognized that the issue of defendant's intent related to touching Kent's genitals in the bathroom was for the jury to decide.

25

The trial court determined that admitting the evidence would invite the jury to speculate that K.S.'s mental illness caused him to fabricate the allegation, despite the absence of evidence that he did so. Additionally, asking the jury to decide whether K.S. had experienced flashbacks of a sexual assault due to posttraumatic stress disorder--as the psychiatric hold had suggested--or whether he was fabricating the allegation due to his psychosis, would add a level of speculation and confusion to the issues and would mislead the jury. Thus, any probative value of the evidence was substantially outweighed by its prejudicial effect and its potential to confuse the issues and mislead the jury.

2. *Analysis*

We set forth the applicable legal standard *ante*. Defendant claims the evidence of K.S.'s mental illness was relevant to his credibility because Dr. O'Donohue testified that K.S.'s mental disorder could have affected the reliability of his memory of the incident, his ability to evaluate what had occurred in light of his paranoia, and the accuracy of his recollection of the incident. However, Dr. O'Donohue also testified that one could rule out that an abuse allegation was a delusion or other symptom of psychosis if the allegation were plausible. Applying the plausibility standard set forth by Dr. O'Donohue in order to determine the relevance of the testimony related to K.S.'s delusions, the trial court noted that there was nothing implausible about K.S.'s accusation, his accusation was corroborated, and he provided significant details about the incident. Given the facts of this case, the court reasonably discounted Dr. O'Donohue's cited statistic that women are less likely to abuse their children than men, and that biological mothers are unlikely to abuse their children, which functioned more as an argument against defendant's liability than an argument against the *plausibility* of K.S.'s allegations. Additionally, while Dr. O'Donohue indicated that urination is not a "sexy event[]," the circumstances of the allegation as testified to by K.S. demonstrates that what occurred between him and defendant was not a typical urination event. Indeed, no urination occurred. Because, based on Dr. O'Donohue's testimony, K.S.'s allegation was not implausible, it was

26

highly unlikely that K.S.'s allegation was the product of a delusional belief. This greatly diminished the probative value of any testimony that speculated the allegation was the product of delusion. Further, there was no indication that K.S. was delusional at the time of the alleged abuse, and there was no evidence that his mental illness had affected his ability to recollect at the time of trial.

Next, defendant contends the trial court erroneously concluded that introduction of evidence of K.S.'s mental disorder would subject him to prejudice. She contends the trial court's intention to protect K.S. from public disclosure of his mental disorder was the type of "temporary embarrassment" that is not a valid basis for excluding relevant impeachment evidence. Defendant relies on *Davis v. Alaska, supra,* 415 U.S. 308, in which the high court concluded that the state's interest in protecting the anonymity of juvenile offenders must yield to the defendant's Sixth Amendment right to probe a witness's potential biases. (*Id.* at p. 319.)

But here, the trial court did not exclude the evidence because it would subject K.S. to temporary embarrassment or based on the state's interest in protecting his privacy. It excluded the evidence as irrelevant, prejudicial, confusing, and misleading, because the evidence was not relevant to K.S.'s credibility and because it would cause the jury to unduly speculate about the nature and effect of K.S.'s mental disorder without an adequate basis for doing so.

Finally, defendant contends the trial court erred by devaluing the exculpatory effect of the mental illness diagnosis evidence by referring to the fact that C.L., Bo.L., and Br.L. corroborated much of K.S.'s testimony. Defendant argues the court's analysis on this point ignored the defense theory that the accusations in this case were based on collusion, and that Br.L. and Bo.L. had convinced K.S. that abuse had occurred while K.S. was in a vulnerable and suggestive state.

Defendant misapprehends the nature of the trial court's ruling. Dr. O'Donohue testified that one way to determine that K.S.'s allegation was not a delusion was to

27

ascertain whether the allegations were corroborated. The court recognized that much of K.S.'s testimony was corroborated by the testimony of Bo.L., Br.L., and C.L. Defendant was entitled to--and did--argue that the corroboration in this case was due to the collusion of the alleged victims. But that does not diminish the propriety of the court's inquiry when determining that K.S.'s testimony was largely corroborated by the other witnesses, such that it was unlikely to have been the product of a *delusion* (as opposed to collusion), which was what the court sought to ascertain in making the specific evidentiary ruling challenged here.

### E. *C.L.'s Anger at Defendant*

Defendant contends the trial court erroneously excluded evidence that C.L. harbored animosity toward her because shortly before he disclosed her abuse, he had reason to believe she informed law enforcement that he was selling drugs.

#### 1. *Background*

The People moved in limine to exclude evidence that C.L. was "dealing drugs" in Wyoming. At the hearing on the motion, defendant asserted that her sister, with whom C.L. was living at the time of the drug-related acts in question, would testify that C.L. and her ex-husband were dealing drugs. Additionally, law enforcement searched C.L.'s house and found marijuana and cocaine, and C.L. pled guilty to cocaine possession. Defendant argued the evidence was relevant because C.L. told his grandmother that the crime involved only marijuana, and his grandmother would testify that C.L. believed defendant had informed law enforcement about his activities, causing him to have "strong animosity" toward her and motivating him to fabricate sexual abuse allegations against her. Counsel noted that C.L. disclosed defendant's abuse in the same year that he was arrested.

The trial court excluded the evidence under section 352. It reasoned that simple possession of cocaine is not a crime of moral turpitude, there was no clear evidence that C.L. was dealing drugs, and the issue was "too far afield and too prejudicial." The court

28

determined that whether C.L. speculated defendant turned him in to law enforcement was irrelevant because such a belief was not sufficiently probative to establish a motive to lie and remained a collateral issue. The court further recognized there was substantial other evidence that C.L. was angry at defendant such that the probative value of defendant's act of turning in C.L. was outweighed by the prejudice involved.[17]

At trial, C.L. acknowledged that he said in a 2018 interview with law enforcement, "There's so much bad blood between my mother and I." He testified, "I despise her [defendant]."

### 2. *Analysis*

Defendant contends the trial court abused its discretion by excluding evidence of C.L.'s drug dealing because it failed to recognize the relevance of the evidence: C.L.'s belief that defendant informed law enforcement of his drug dealing made it more likely that he fabricated the abuse allegations. She argues the court improperly relied on the fact that C.L.'s belief that defendant turned him in was speculative because the relevance of the evidence was that C.L. held the belief, not whether his belief was well-founded.

We disagree that the trial court failed to appreciate defendant's argument as to the relevance of the proposed evidence. The court expressly concluded that C.L.'s belief his mother turned him in was irrelevant because, even if he held that belief, such a belief was not sufficient to establish a motive to fabricate molest allegations. Thus, the court concluded that the evidence had minimal probative value in establishing C.L.'s motive to lie, and evidence that C.L. possessed marijuana and cocaine was highly prejudicial.[18] As

---

[17] The court also excluded evidence that C.L. told his grandmother that his crime involved only marijuana; C.L.'s act of minimizing his crime to his grandmother "hardly seem[ed] like the kind of shocking thing that is going to move the needle any direction."

[18] Defendant asserts that the trial court's comments were rife with "red herrings," but she ignores the fact that the court's comments were made in response to the various arguments presented by counsel. Indeed, during the argument on this issue, the court

29

we have set forth *ante,* evidence of C.L.'s animosity towards defendant was already before the jury, further reducing the offered evidence's probative value. In the absence of any other argument that the trial court's ruling was an abuse of discretion, defendant failed to satisfy her burden. (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1035 [rejecting claim that § 352 required exclusion of testimony because defendant failed to show prejudice within the meaning of § 352].)[19]

### F. *Br.L.'s False Statements*

Defendant contends the trial court abused its discretion by excluding evidence that Br.L. certified multiple false statements when submitting a financial aid form--the Free Application for Federal Student Aid (FAFSA)--related to his college enrollment.

#### 1. *Background*

Defendant moved in limine to admit evidence that Br.L. had signed three letters under penalty of perjury related to his application for financial aid, and that the letters

---

admonished defense counsel twice for continuing to change her arguments after the court had ruled.

[19] Following oral argument and after the case was submitted, defendant pointed us to the recently filed opinion in *People v. Castaneda-Prado* (Aug. 30, 2023) ___ Cal.App.5th ___ [2023 Cal.App. Lexis 664], which she contends supports her argument. In *Castaneda-Prado*, the appellate court concluded that the trial court abused its discretion and violated the defendant's constitutional right to confront witnesses against him by excluding evidence regarding a complaining witness's motive to fabricate sexual abuse allegations; specifically, evidence of the witness's belief that accusing the defendant of sexual molestation would help her mother obtain a " 'U visa' " that could provide legal status. (*Id.* at pp. *1-*2, *42.) The court observed that the trial court had acknowledged the weighty probative value of the evidence and concluded that the trial court abused its discretion by erroneously determining the visa-related evidence might consume an undue amount of time, distract the jury, and prejudice the witness. (*Id.* at pp. *36-*37, *40-*46.) *Castaneda-Prado* is distinguishable from this case. Here, as we have discussed, the trial court concluded the evidence was irrelevant because it was insufficient to support a motive to lie *and* was highly prejudicial.

included demonstrably false statements.[20]  Defendant intended to prove that the letters provided motive for Br.L. to lie about the abuse because the letters stated that his mother had sexually abused him.

The trial court ruled that defendant could impeach Br.L. with the untrue statements in the letters submitted in support of his financial aid application.  Initially, the court observed with respect to the letters:  "It's filed -- you can ask him, filed under penalty of perjury, right?"  However, the court and defendant subsequently agreed that the letters appeared to have been sent to USC directly--not as part of his FAFSA documentation, which requires that documents be submitted under penalty of perjury--and thus there was no evidence that the letters were submitted under penalty of perjury.  Specifically, the conversation unfolded in relevant part as follows:

"MS. FERRENTINO:  Well, I want to indicate that he submitted this under penalty of perjury to USC in an effort to find financial aid, and that's a motive for him to lie in this case.

[¶] . . . [¶]

"THE COURT:  So this is a letter that he is trying to get financial aid.  He stated things here that are verifiably lies.  Impeach him with it.  [¶]  It's filed -- you can ask him, filed under penalty of perjury, right?

"MS. COCHRANE:  This penalty of perjury form that I was given is page 1 of 2.  At the top it's '2019-2020 FAFSA Web Signature Page.'

---

[20]  The letters stated that all of Br.L.'s grandparents were dead (defense counsel represented that three of his grandparents were alive, but later stated that only one was alive), his father had been in and out of prison his entire life and had been gone since he was six months old (counsel represented that his father had joint custody over him until he was 12 years old, and he regularly visited his father three times per week during that time), and he was handling the legal issues related to his mother and was solely responsible for finding a safe environment for his young siblings (counsel represented that Br.L.'s siblings lived with their father, who provided for them).

31

"THE COURT:· Every year you have to file a FAFSA, so it sounds like maybe this might have been done, but do you have any proof that this one was done in that way or -- because as I recall you can't submit letters with a FAFSA.  A FAFSA is an independent thing.

[¶] . . . [¶]

"MS. FERRENTINO:  *The school may have you upload letters with their own application.*

"THE COURT:  *That would go to the school.*"  (Italics added.)

And:

"THE COURT:  So it sounds to me -- *I was worried we need to get him a lawyer, but it doesn't sound to me, if he didn't sign this under penalty of perjury, there is no need for a lawyer to be appointed.*

"MS. FERRENTINO:  *I don't see a penalty of perjury through USC directly.*

"THE COURT:  Okay.

"MS. FERRENTINO:· But that's where the FAFSA may say something different.  [¶]  Like I say, [Bo.L.] checked boxes, and that is under penalty of perjury.  That doesn't correspond with reality or the truth.

"THE COURT:· Let's stick with [Br.L.].  [¶]  Anything else on [Br.L.] we need to talk about?

"MS. FERRENTINO:· There is a report --

"MS. COCHRANE:· I'm so sorry, Your Honor.  [¶]  *Where are we then with this alleged penalty of perjury for the letters?  I understand that this penalty of perjury page goes to the FAFSA application.*

"THE COURT:  *So she could not use that as to this, because there is clearly -- unless she can come up with something that shows this was submitted under penalty of perjury*, it doesn't make it any less of a lie if it's not true, but I don't think he faces any legal jeopardy in the same way."  (Italics added.)

32

During his trial testimony, Br.L. acknowledged that he had written the letters, testified about the contents of the letters, and explained that he was attempting to get both a federal loan and a scholarship from USC. Defendant asked if the financial aid application was signed under penalty of perjury, and the court sustained the prosecution's objection.

2. *Analysis*

Defendant contends the trial court improperly refused to permit her to cross-examine Br.L. regarding his certification of false statements with knowledge of the potential criminal penalties. She contends the court's error was "particularly indefensible" given that it had previously assured counsel that she could ask defendant whether he had filed the letters under penalty of perjury. The People agree with defendant that the trial court mistakenly prohibited counsel from questioning Br.L. about signing the financial aid application under penalty of perjury, but contends the error was harmless. The parties misread the record; we have reviewed the reporter's transcript in relevant part and see no error.[21]

To support her assertion that the trial court had previously authorized counsel to question Br.L. about whether he submitted the letters under penalty of perjury, defendant points to the trial court's statement: "It's filed - you can ask him, filed under penalty of perjury, right?" However, that comment preceded the subsequent discussion, as we have set forth in full *ante*, at the conclusion of which the court and defendant agreed that she *could not* prove the letters were submitted under penalty of perjury as part of Br.L.'s FAFSA application. Instead, the evidence showed that Br.L. had sent the letters to USC,

---

[21] We rely solely on the record, specifically the reporter's transcript as quoted *ante*, to reach this conclusion and do not rely on the parties' representations at oral argument regarding any trial exhibits or other portions of the record not referenced herein. Because we conclude there was no error, we need not and do not reach the harmless error analysis advanced by the People.

and defendant acknowledged there was no evidence that documents sent to USC were submitted under penalty of perjury. Accordingly, while the court authorized defendant to question Br.L. about the false statements in the letters, the court had found there was no evidence that the letters were submitted under penalty of perjury, and the court did not abuse its discretion when it sustained the People's objection.

G. *Br.L.'s Drug and Alcohol Use*

Defendant claims the trial court improperly excluded evidence that Br.L. avoided contact with her during 2017 to 2018 due to his alcohol and drug abuse.

1. *Background*

During jury deliberations, the trial court put on the record evidentiary rulings that had previously been unreported. The court had prohibited defendant from eliciting testimony that Br.L. had admitted to R.L. and defendant that he had been using drugs and drinking alcohol in the summer of 2016 while working for his aunt in San Jose, while attending college in the fall of 2016, and during the 2016 winter break, and that he wanted to leave Baylor University, where he had been enrolled before later attending USC. Defendant intended to introduce the evidence to show that defendant and R.L. were concerned about Br.L.'s well-being and wanted him to come home and "reset" rather than go to San Jose to work with his aunt as he was planning.

The trial court recognized that there had been much testimony about defendant's and R.L.'s concern for Br.L., and that defendant and R.L. did not want Br.L. to go work for his aunt. The court noted that "most of that evidence came in," but that it had excluded evidence that Br.L. was using drugs and alcohol. The court reasoned that the evidence did not weigh on Br.L.'s credibility because many college students drink alcohol and experiment with drugs, there was little probative value to evidence that defendant and R.L. did not want Br.L. to go to his aunt's house due to his alcohol and drug use, and the prejudicial effect of the testimony substantially outweighed its probative value.

34

2. *Analysis*

Defendant claims that the trial court misapprehended the probative value of the excluded evidence. She argues Br.L. took every opportunity to portray his parents as uncaring and unsupportive of him, and the excluded evidence showed that Br.L.'s parents were concerned about him as he was "in the throes of alcohol and drug abuse," and to rebut the inference that Br.L. did not return home due to his anger over the alleged molestation.

Defendant's argument fails to persuade us that the trial court's ruling was an abuse of discretion. The thrust of defendant's argument is that the evidence would have supported her position that she and R.L. were concerned about him. But the court observed that there was substantial evidence in the record that defendant and R.L. were concerned about Br.L. and wanted to help him, and it is not clear how the additional evidence that Br.L. was using drugs and alcohol would have further demonstrated that defendant cared about Br.L.[22]

Defendant contends the trial court failed to specifically identify how the evidence was prejudicial. She contends that evidence of Br.L.'s drug and alcohol use would not have caused the jury to view him as a leper or pariah, but rather as someone who needed help. Initially, the court was not required to expressly identify the prejudicial effect of the evidence; all that was required was that " 'the record demonstrate the trial court understood and fulfilled its responsibilities under Evidence Code section 352.' " (*Williams*, *supra*, 16 Cal.4th at p. 213.) Further, the potential prejudicial effect of

---

[22] The parties disagree on whether Br.L. was "using" or "abusing" drugs and alcohol. At trial, defendant did not assert that Br.L. was "abusing" drugs and alcohol, but on appeal she argues that the effect of Br.L.'s drug and alcohol use was such that she and R.L. were concerned for Br.L.'s well-being. This distinction does not affect the trial court's ruling, which was based on the fact that evidence of Br.L.'s drug and alcohol use was unnecessary to prove that his parents were concerned about him.

evidence that Br.L. was using drugs and alcohol is manifest. "Evidence of a witness's drug use is inadmissible unless the testimony 'tends to show that the witness was under the influence thereof either (1) while testifying, or (2) when the facts to which he testified occurred, or (3) that his mental faculties were impaired by the use of such narcotics.' " (*People v. Panah, supra*, 35 Cal.4th at p. 478.) "[P]roof of a narcotic addiction, standing alone, is inadmissible to impeach the credibility of a witness and that such evidence is not only collateral thereto but highly prejudicial." (*People v. Hernandez* (1976) 63 Cal.App.3d 393, 405; see *People v. Cardenas* (1982) 31 Cal.3d 897, 907 ["The impact of narcotics addiction evidence 'upon a jury of laymen [is] catastrophic' "].) Because the evidence was minimally relevant to prove that defendant cared about Br.L., and was prejudicial, the trial court did not abuse its discretion by excluding the evidence.

H. *Bo.L.'s Pretext Call*

Defendant contends the trial court improperly excluded evidence that Bo.L. lied to and attempted to manipulate defendant during a pretext call arranged by law enforcement, which she argues undermined Bo.L.'s credibility.

1. *Background*

The prosecution moved in limine to preclude defendant from introducing evidence that she made out-of-court statements during a pretext call denying that she committed sexual abuse.[23] At the hearing on the motion, the prosecutor explained that a detective set up a pretext telephone call between Bo.L. and defendant that would not be offered into evidence. The prosecutor confirmed that the call was "a classic pretext phone call that an officer authorizes to be tape-recorded, and the officer gives certain questions that

---

[23] Neither a recording of the pretext call nor a transcript of the call was marked as an exhibit at trial or included in the record on appeal. Defendant has filed a petition for writ of habeas corpus alleging ineffective assistance of counsel, which includes a transcript of the call. (*In re Patricia Lane* (C098252, petn. pending).)

need to be asked." The prosecutor argued that defendant's statements constituted hearsay and were admissible only if offered against her. (§ 1220.)

Defendant argued the pretext call was relevant and admissible to show that Bo.L. made contradictory statements about the allegations, was willing "to go along with what the officer asked him to do to manipulate [defendant] on the phone," and was willing to minimize his allegations when talking to her.

The trial court excluded the evidence. It concluded defendant's self-serving statements were inadmissible hearsay. The court further concluded that Bo.L.'s state of mind while making the call was irrelevant. It reasoned that the purpose of the call was to trick defendant into thinking she could be open and honest, and in the context of a pretext call, Bo.L. was acting as a tool of law enforcement. The court reiterated that Bo.L.'s statements during the call "aren't his words."

### 2. *Analysis*

Defendant contends the trial court erroneously focused on the admissibility of defendant's self-serving statements, rather than on Bo.L.'s statements, and she was entitled to introduce evidence of the pretext call as a specific instance of Bo.L.'s "mendacious behavior" to illustrate and confirm his bad character for truthfulness.

We disagree with defendant's argument that the trial court focused only on the admissibility of defendant's statements. As we summarized *ante*, the trial court expressly rejected the argument defendant raises on appeal. The court concluded that Bo.L.'s statements during the call were not his own because he was acting as a tool of law enforcement, and therefore the statements he made during the call were not relevant to prove his bad character. That conclusion was not an abuse of discretion. There was no evidence that Bo.L.'s statements during the pretext call represented his "mendacious behavior"; rather, as the court recognized, Bo.L.'s participation in the call demonstrated only his willingness to assist law enforcement in its investigation. The court allowed defendant to question Bo.L. about his cooperation in the investigation.

Defendant argues there is no evidence that Bo.L.'s statements were at law enforcement's request, rather than Bo.L.'s statements made on his own initiative. We disagree. The evidence before the court was that Bo.L. was asked to participate in a law enforcement-driven pretext call "done as a ruse by an officer," in which the officer gave Bo.L. "certain questions that need to be asked, that kind of thing." Indeed, *defense* counsel argued that the evidence was relevant "to [Bo.L.'s] willingness *to go along with what the officer asked him to do* to manipulate [defendant] on the phone." (Italics added.) Thus, we disagree with defendant that there was no evidence that Bo.L.'s statements were made in compliance with an officer's request.

Defendant relies on *People v. Dalton* (2019) 7 Cal.5th 166, in which our Supreme Court concluded a defendant could impeach a prosecution witness with evidence that the witness was a con man with multiple felony convictions, and whose modus operandi involved "posing as an exterminator in eight of the burglaries and a drapery cleaner in the four other burglaries to obtain trust and access to money and jewelry, and to demonstrate 'he is a manipulator' and 'an imposter.'" (*Id.* at p. 211.) *Dalton* is distinguishable. Unlike the relevant evidence at issue in *Dalton*, Bo.L.'s statements were made while he was acting as a tool of law enforcement with the express purpose of manipulating defendant into making incriminating statements. Bo.L.'s statements made during that call are relevant to the issue of whether he participated in the law enforcement investigation of defendant's crimes, but not of his character for truthfulness. The trial court did not abuse its discretion by excluding evidence of the pretext call.

I. *Defendant's Report of Sexual Conduct by a Family Member Against Bo.L.*

Defendant contends the trial court improperly excluded evidence that she reported to law enforcement that another family member had inappropriate sexual contact with Bo.L.

1. *Background*

Defendant moved to admit evidence that she reported to law enforcement that Bo.L. had been sexually assaulted by a relative and, when Bo.L. was interviewed, he did not disclose that he had been abused by defendant. The alleged incident occurred when the family was together and drinking alcohol--including defendant and Bo.L., who was 15 at the time--at a house belonging to K.S.'s father and his wife. The wife made sexual advances on Bo.L., touched him inappropriately, and they kissed. When defendant became aware of what was going on, she contacted law enforcement. Police officers interviewed defendant, Bo.L., and the rest of the family. Bo.L. did not disclose that he had been sexually abused by defendant during the interview, but he disclosed defendant's abuse a month later. Defendant later told police officers that a lot of the night was "fuzzy" due to her drinking and being upset with the situation. No criminal charges were filed related to the incident.

Defense counsel argued that the evidence was relevant because Bo.L. did not disclose defendant's abuse despite having the opportunity to do so, and because defendant's act of reporting the abuse was inconsistent with the conduct of a person who had sexually abused her own children, which "undermine[d] any consciousness of guilt or anything else like that." The court initially suggested that defendant's report of the incident was irrelevant unless she testified, in which case she could testify about her state of mind when making the report.

The prosecutor argued the evidence should be excluded under section 352. The prosecutor disagreed with defense counsel's assessment that a person who sexually abused her own child would never report that the child was abused by someone else, argued that admitting the evidence would be "going down a rabbit hole," and argued that it would be "misleading for the jury to hear any of this."

Upon hearing the context of the incident, summarized *ante*, the trial court excluded the evidence under section 352. The court recognized there was some relevance

39

to the fact that Bo.L. did not disclose his mother's sexual abuse during his interview.  But it concluded that the probative value of the evidence was outweighed by the undue consumption of time because admitting the evidence would entitle the prosecution to put the incident in its proper context, including that the people involved in the incident were drinking alcohol, and would lead to "trying a different case."  The court further concluded that it would be confusing and misleading to litigate the issues of whether Bo.L. would or would not have disclosed abuse in a specific context, or whether defendant would or would not have reported the incident had she previously abused Bo.L.  Finally, the court recognized that the defense had multiple witnesses who would testify that the alleged victims in this case had multiple opportunities to report the abuse but did not do so.

2. *Analysis*

Defendant contends the trial court abused its discretion by excluding evidence that Bo.L. did not disclose defendant's abuse to the police officer during his interview, despite acknowledging its relevance, on the bases that admitting the evidence would require an undue consumption of time and would be confusing and misleading to the jury.  She argues presenting the evidence would require only brief, straightforward testimony from Bo.L. and the interviewing officer, and the exculpatory nature of the evidence outweighed the court's concern about the admission of collateral evidence.  She asserts that Bo.L.'s nondisclosure was particularly relevant because Bo.L. disclosed the abuse to Lisa Larson less than a month after his interview.

We disagree that the trial court abused its discretion by concluding presenting the evidence would require an undue consumption of time.  As the court recognized, after defendant established the fact of her report and Bo.L.'s nondisclosure, the prosecution would have been entitled to present evidence to put the incident in its proper context in order to rebut the inferences defendant sought to draw from the evidence.  For example, the prosecution would have been entitled to introduce evidence that defendant was

40

intoxicated and other evidence of her conduct on the night in question to rebut the inference that she would not have reported the incident had she abused Bo.L. herself. Similarly, the prosecution would have been entitled to introduce evidence of the incident and Bo.L.'s interview to rebut the inference that Bo.L.'s nondisclosure occurred at a time when someone who had been abused would have disclosed the abuse. Although the decision could have reasonably gone the other way, we cannot say that the court's conclusions here were an abuse of its broad discretion.

Defendant also challenges the trial court's statement that other witnesses would testify that the victims had multiple opportunities to disclose the abuse over the years and did not do so. Defendant notes that the evidence showed only that C.L. and Br.L. had prior opportunities to disclose the abuse, not Bo.L. We agree with defendant that the evidence before the court at the time of its ruling did not indicate that Bo.L. had attended individual therapy sessions with Lisa Larson before 2017. However, the nature of the defense was that C.L., K.S., Br.L., and Bo.L. jointly decided to fabricate sexual abuse allegations against defendant. The court's comment referenced the fact that multiple witnesses would testify that the victims had multiple opportunities to report the abuse but did not. While it may be that Bo.L. did not have such an opportunity, the fact that the other witnesses had multiple opportunities to report the abuse makes the point that defendant sought to make--that the victims did not disclose the abuse for years, despite having opportunities to do so. The trial court did not abuse its discretion by concluding that the probative value of Bo.L.'s opportunity to disclose the abuse after a drunken report by his mother of an unrelated sexual incident between her teenage son (who was also drinking and was with his mother) and another woman, was outweighed by the undue consumption of time required to contextualize the nondisclosure.

Finally, defendant claims the trial court improperly excluded evidence of defendant's report because the evidence constituted "consciousness of innocence." At trial, defendant formulated her argument slightly differently; that reporting sexual abuse

41

committed by another person is behavior inconsistent with that of a person who had abused the same victim, and that the evidence "undermine[d] any consciousness of guilt or anything else like that." Defendant's argument fails to persuade for the same reasons discussed *ante*. The court determined it would consume an undue amount of time and would confuse the issues and mislead the jury to conduct a trial within a trial to determine whether defendant, while intoxicated at a family party, would have reported the alleged abuse by another woman had she formerly abused Bo.L. herself. Presenting that issue to the jury would have entitled the prosecution to put defendant's mindset at the time of her report within its proper context. The court did not abuse its discretion when it determined that the probative value of the evidence was substantially outweighed by the factors set forth in section 352.[24]

## II

### *Sufficiency of the Evidence to Support Count 15*

Defendant contends insufficient evidence supported the verdict as to count 15, which alleged that defendant sexually abused K.S. by touching his penis and testicles, as we recounted *ante*. We disagree.

A. *Applicable Law*

A jury convicted defendant of violating Penal Code section 288, subdivision (a) as to K.S. That statute states in relevant part: "[A] person who willfully and lewdly commits any lewd or lascivious act . . . upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing

---

[24] Defendant argues that the cumulative effect of the evidentiary errors she has asserted requires reversal. "In examining a claim of cumulative error, the critical question is whether [the] defendant received due process and a fair trial. [Citation.] A predicate to a claim of cumulative error is a finding of error. There can be no cumulative error if the challenged rulings were not erroneous." (*People v. Sedillo* (2015) 235 Cal.App.4th 1037, 1068.) Because we have found no error, defendant's claim necessarily fails.

42

to, or gratifying the lust, passions, or sexual desires of that person or the child, is guilty of a felony." "The intent with which the act is done is manifested by the circumstances under which the act is committed. [Citation.] Each case involving a lewd act must be decided on its own facts." (*In re Paul C.* (1990) 221 Cal.App.3d 43, 54.) Intent is " 'rarely susceptible of direct proof' " and instead " 'must usually be inferred from all the facts and circumstances disclosed by the evidence.' " (*People v. Falck* (1997) 52 Cal.App.4th 287, 299.) Circumstances considered relevant to the question of defendant's intent to arouse, appeal to, or gratify the lust, passions, or sexual desires of defendant or the child can include: the charged act, defendant's extrajudicial statements, other acts of lewd conduct charged in the case, the relationship of the parties, and coercion or deceit used to obtain the victim's cooperation or avoid detection. (*People v. Martinez* (1995) 11 Cal.4th 434, 445.)

"In reviewing a sufficiency of evidence claim, the reviewing court's role is a limited one. ' "The proper test for determining a claim of insufficiency of evidence in a criminal case is whether, on the entire record, a rational trier of fact could find the defendant guilty beyond a reasonable doubt." ' " (*People v. Smith* (2005) 37 Cal.4th 733, 738-739.) " 'In applying this test, we review the evidence in the light most favorable to the prosecution and presume in support of the judgment the existence of every fact the [trier of fact] could reasonably have deduced from the evidence. [Citation.] "Conflicts and even testimony [that] is subject to justifiable suspicion do not justify the reversal of a judgment, for it is the exclusive province of the trial judge or jury to determine the credibility of a witness and the truth or falsity of the facts upon which a determination depends. [Citation.] We resolve neither credibility issues nor evidentiary conflicts; we look for substantial evidence. [Citation.]" [Citation.] A reversal for insufficient evidence "is unwarranted unless it appears 'that upon no hypothesis whatever is there sufficient substantial evidence to support' " the jury's verdict.' " (*People v. Manibusan* (2013) 58 Cal.4th 40, 87.)

B. *Analysis*

There is no direct proof of defendant's lewd intent related to the incident involving K.S. that was charged in count 15, but there is enough circumstantial evidence for a jury to properly infer the requisite intent. At the outset, defendant's conduct must be placed in the proper context. While the relationship between defendant and K.S.--half-siblings, but in practice more like mother/son--may not be the kind of relationship that would commonly be associated with sexual attraction, the evidence demonstrated that defendant was attracted to young boys and that she molested her biological children Br.L., Bo.L., and C.L., who was about the same age as K.S.

Defendant argues on appeal that it was K.S. who initiated the interaction, but that argument fails to appreciate the context of their interaction. As we have described, defendant routinely walked around naked in her house in front of K.S. and her children, and there were occasions when K.S. was in elementary school when she would require his presence while she showered, causing K.S. to become physically attracted to her. In other words, defendant had laid the groundwork for their sexualized relationship. Further, K.S. testified that defendant had not helped him urinate for several years before this incident. Thus, while we recognize the evidence showed that K.S. initially told defendant that he needed to go to the bathroom, and that he did so for the purpose of manipulating her into "helping" him, the jury could reasonably infer that when defendant offered to accompany K.S., she intended to seize the opportunity presented by K.S. to molest him. Indeed, when K.S. told defendant that he needed to urinate, it was defendant who asked K.S. if he needed help. To suggest that defendant was simply the unwitting victim of K.S.'s manipulation is to ignore the context of their relationship, and defendant's relationships with her other young boys.

Defendant also argues that the evidence was insufficient to prove her lewd intent because an adult person holding a seven-year-old's penis is necessarily going to be touching the seven-year-old's testicles, and the incident only lasted 10 to 15 seconds. We

44

disagree.  First, there is no requirement that the lewd or lascivious act be of any specific duration, and defendant offers no support for the assertion that she could not have had a lewd intent during an interaction lasting 10 to 15 seconds.  Indeed, our Supreme Court has recognized that " 'a lewdly intended embrace innocently and warmly received by a child might violate [Pen. Code] section 288.' "  (*People v. Lopez* (1998) 19 Cal.4th 282, 290.)  If a brief hug can constitute a lewd act if accompanied by the requisite intent, so can holding a boy's penis.

Second, we disagree with defendant's characterization that her fingers were merely incidentally touching K.S.'s testicles.  K.S. testified that "the rest of the hand was *around* my testicles." (Italics added.)  Thus, even if it were true that an adult using two fingers to point a child's penis toward a toilet bowl would incidentally touch the child's testicles, that was not K.S.'s testimony, and a reasonable jury could have inferred that defendant's act of cupping his testicles demonstrated her lewd intent.  We do not reweigh the evidence on appeal.  (*People v. Manibusan, supra,* 58 Cal.4th at p. 87.)

Finally, defendant argues the evidence was insufficient because she had previously helped K.S. urinate.  But the fact that defendant had helped K.S. urinate as a substantially younger child does not demonstrate that she lacked a lewd intent while ostensibly helping him to urinate years later.  Substantial evidence supports the verdict.

### III

### *Sentencing*

Defendant claims the trial court improperly imposed consecutive sentences because it improperly relied on unsupported factors in aggravation and refused to consider factors in mitigation.  She also contends that we must remand for the court to consider its sentencing discretion under recently enacted Senate Bill No. 567 (2020-2021 Reg. Sess.) (Stats. 2021, ch. 731, § 1) (Senate Bill No. 567).  We conclude defendant forfeited her arguments regarding the court's application of aggravating and mitigating factors, and Senate Bill No. 567 does not apply.

45

A.  *Discretion to Impose Consecutive Sentences*

Penal Code section 669 "grants the trial court broad discretion to impose consecutive sentences when a person is convicted of two or more crimes." (*People v. Shaw* (2004) 122 Cal.App.4th 453, 458.)  "The sentencing rules specify several criteria to guide the trial court's determination whether to impose consecutive or concurrent terms." (*Ibid.*)  California Rules of Court, rule 4.425, sets forth factors to be considered by the trial court in deciding whether to impose consecutive or concurrent sentences.[25]  Rule 4.425(b) provides that the court may also consider "[a]ny circumstances in aggravation or mitigation," which are set forth in rules 4.421 and 4.423.  "Only one criterion or factor in aggravation is necessary to support a consecutive sentence." (*People v. Davis* (1995) 10 Cal.4th 463, 552.)  We review the court's determination to impose consecutive sentences for abuse of discretion (*People v. Bradford* (1976) 17 Cal.3d 8, 20, questioned on other grounds in *People v. Dawkins* (2018) 24 Cal.App.5th 698, 706), and we review the rule 4.425 findings of the court for substantial evidence (*People v. Oseguera* (1993) 20 Cal.App.4th 290, 294).

B.  *Procedural Background*

The presentence probation report recommended that the trial court impose consecutive terms on defendant's four counts of conviction.  With respect to criteria affecting consecutive sentencing, the probation report noted that the crimes involved "separate acts of violence" and were committed against different victims at different times and different places.  (Rule 4.425(a)(2), (3).)  The report also cited several factors in aggravation, including (1) the crimes involved great violence and disclosed a high degree of cruelty and callousness (rule 4.421(a)(1)); (2) the manner in which the crime was carried out indicated planning (rule 4.421(a)(8)); (3) defendant took advantage of a

---

[25]  Further undesignated rule references are to the California Rules of Court.

position of trust to commit the offense (rule 4.421(a)(11)); and (4) defendant engaged in violent conduct indicating a serious danger to society (rule 4.421(b)(1)). The report noted one circumstance in mitigation: defendant had no prior record of criminal conduct. (Rule 4.423(b)(1).)

At the sentencing hearing, the trial court stated that it had read and considered the probation report. The court was aware of its discretion to run the sentences concurrent, but it imposed consecutive sentences based on the criteria affecting sentencing listed in the probation report. The court found significant aggravating circumstances identical to those stated by the probation report, and it balanced those aggravating factors against the sole mitigating circumstance: defendant's lack of a criminal record. The court noted: "There are other things about [defendant] and her life that perhaps one could look at and say that they contributed to this, but they don't qualify as circumstances in mitigation under the Rules of Court." The court observed that it might have been swayed if defendant had showed remorse for her crimes, but she had not. The court found "that the proper measure of justice in this case" was to run the sentences consecutively.

C. *Analysis*

Defendant claims the trial court abused its discretion by (1) characterizing her offenses as "violent"; (2) considering her lack of remorse to be an aggravating factor; (3) failing to consider defendant's positive attributes or her difficult background. The People contend that defendant forfeited these claims on appeal by not raising them at sentencing.[26]

---

[26] Defendant does not respond to this argument in her reply brief. By failing to respond to respondents' counterargument in the reply brief, defendant tacitly admits that she has forfeited her argument. (See *Rudick v. State Bd. of Optometry* (2019) 41 Cal.App.5th 77, 89-90.)

Taking defendant's arguments in turn, we first conclude that she forfeited her argument that her crimes did not involve violence. Generally, "[a] party in a criminal case may not, on appeal, raise 'claims involving the trial court's failure to properly make or articulate its discretionary sentencing choices' if the party did not object to the sentence at trial. [Citation.] The rule applies to 'cases in which the stated reasons allegedly do not apply to the particular case, and cases in which the court purportedly erred because it double-counted a particular sentencing factor, misweighed the various factors, or failed to state any reasons or give a sufficient number of valid reasons,' [citation], but the rule does not apply when the sentence is legally unauthorized." (*People v. Gonzalez* (2003) 31 Cal.4th 745, 751 (*Gonzalez*).)

The general rule of forfeiture is inapplicable if the trial court fails to give the parties any meaningful opportunity to object. (*Gonzales*, *supra*, 31 Cal.4th at p. 752.) Thus, the forfeiture rule only applies "when the trial court 'clearly apprise[s]' the parties 'of the sentence the court intends to impose and the reasons that support any discretionary choices' [citation], and gives the parties a chance to seek 'clarification or change' [citation] by objecting to errors in the sentence. The parties are given an adequate opportunity to seek such clarifications or changes if, at any time during the sentencing hearing, the trial court describes the sentence it intends to impose and the reasons for the sentence, and the court thereafter considers the objections of the parties before the actual sentencing." (*Ibid.*)

Our Supreme Court has recognized that, " '[a]s a practical matter, both sides often know before the hearing what sentence is likely to be imposed and the reasons therefor. Such information is contained in the probation report, which is required in every felony case and generally provided to the court and parties before sentencing.' " (*Gonzalez*, *supra*, 31 Cal.4th at p. 751; *People v. Scott* (1994) 9 Cal.4th 331, 350-351.) Here, defendant received the probation report before the sentencing hearing, which characterized the crimes as crimes of violence. Defendant filed a sentencing

48

memorandum, in which she argued against the consecutive sentences advocated for by the probation report but did not argue that her crimes did not involve violence. Nor did she make such an argument at the sentencing hearing when the court allowed her to argue for her sentencing recommendations. Thus, defendant had ample opportunity to influence the court's sentencing choices by raising the argument she raises here, both before and during the sentencing hearing, and she failed to do so. Based on the record, defendant cannot claim she was not "apprised" of the potential sentence or was deprived of the opportunity to seek a clarification or change in the sentence had she objected. (Cf., *People v. Superior Court* (*Dorsey*) (1996) 50 Cal.App.4th 1216, 1224 [trial court placed the defendant on probation in the interest of justice even though he was presumptively ineligible and then immediately declared a recess without hearing from either party did not provide a meaningful opportunity to object].)

In any event, we see no prejudicial error resulting from the trial court's two brief passing references to violence during the sentencing hearing, made in the context of orally reviewing the contents of the probation report with the parties. Although the court did mention in passing that the crimes "involved" "great violence" and that defendant had "engaged in violent conduct" indicating a danger to society, the court clearly did not focus its attention on these misstatements contained in the probation report or base its decisions upon them. First, the court had heard the testimony and other evidence presented in this case; the court was well aware of the specifics of defendant's offenses and the fact that no "violent conduct" per se had been alleged and proven. Second, in selecting the sentence, the court focused its attention primarily on the four separate victims in this case, as well as defendant's position of trust in relation to her victims, indicating that this breach of trust was "enormous, so treasonous really, to her family." Whether the crimes of conviction were properly classified as "violent" was not an issue at sentencing, either with the parties or with the court.

49

Next, we do not need to consider whether defendant forfeited her argument that the trial court considered her lack of remorse to be an aggravating factor because her argument clearly lacks merit. The court stated that it would have been "swayed" had defendant showed remorse for her crimes at the sentencing hearing but observed that she did not. The court's statement demonstrates that it did not consider "lack of remorse" to be a *mitigating* factor because, simply put, defendant had failed to show remorse. However, nothing in the court's statement suggests that it considered the absence of this mitigating factor to instead be an *aggravating* factor. (See *People v. Osband* (1996) 13 Cal.4th 622, 706 [" 'If a factor is not found to be a mitigating factor, that does not make the factor an aggravating factor' "].)

Finally, defendant contends the trial court erred by failing to consider non-statutory mitigating evidence regarding her background and character. Specifically, she contends the trial court recognized but failed to consider as mitigating evidence that defendant "has done many good things in her life, and has affected many people in a positive way," her positive attributes, or her difficult background. Additionally, she argues that the court unreasonably disparaged letters in support as "enabling" her behavior.

Sentencing courts have wide discretion in weighing aggravating and mitigating factors (*People v. Evans* (1983) 141 Cal.App.3d 1019, 1022) and may balance them in qualitative as well as quantitative terms. (See *People v. Lambeth* (1980) 112 Cal.App.3d 495, 501.) We presume that the trial court has considered all relevant criteria in deciding a defendant's sentence. (Rule 4.409.) We must affirm unless there is a clear showing that the chosen sentence was arbitrary or irrational. (*People v. Hubbell* (1980) 108 Cal.App.3d 253, 260.)

We disagree that the trial court did not consider evidence that defendant had "done many good things in her life" and "has affected many people in a positive way," or that defendant had positive attributes and a difficult background. The court expressly

50

recognized: "In this case justice demands a very hard decision. On the one hand [defendant] has done many good things in her life, and has affected many people in a positive way. But when you ask what is the proper measure of justice, you have to look at the harm that she did in this case." The court subsequently observed that "[t]here are other things about her and her life that perhaps one could look at and say that they contributed to this, but they don't qualify as circumstances in mitigation under the Rules of Court." In other words, the court recognized that defendant had done good things in her life, had affected others in a positive way, and had a difficult background, but it reached the conclusion that these factors did not rise to the level of mitigating circumstances. (See *People v. Thompson* (1982) 138 Cal.App.3d 123, 127 ["In stating 'no mitigation' the court was merely rejecting the mitigating influences as being insignificant"].) Thus, although defendant frames her claim as the court's failure to consider her mitigating evidence, in actuality she claims that the court failed to give sufficient weight to her mitigating evidence. That contention "does not reflect a valid appellate challenge to the trial court's decision." (*People v. Landry* (2016) 2 Cal.5th 52, 124.)

Defendant also argues that the trial court's characterization of the 41 letters she received in support had "no rational or logical basis." The court noted that while each of the letters extolled defendant's virtues, only *one* of the letters mentioned the victims in this case, and even that letter implied that the boys had created a " 'new reality.' " The court observed that none of the letters asked for justice, acknowledged defendant's guilt, or asked for her to be held accountable. Instead, the court noted that the letters supported defendant because those writing the letters believed that she was innocent. By failing to hold defendant accountable, the court concluded that her family and friends had enabled her behavior. While defendant might disagree with the court's comments, this argument is also an invalid appellate challenge to the trial court's decision.

D.  *Senate Bill No. 567*

Defendant claims that we must remand for resentencing pursuant to recent changes to the law made by Senate Bill No. 567.  Under the newly amended version of Penal Code section 1170 as amended by Senate Bill No. 567, when a judgment of imprisonment is to be imposed and a statute specifies three possible terms, "the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in [Pen. Code, § 1170, subd. (b)(2)]."  (Pen. Code, § 1170, subd. (b)(1).)  But Senate Bill No. 567 has no application here, where the trial court imposed four consecutive *indeterminate* sentences.[27]

## DISPOSITION

The judgment is affirmed.


                                                      /s/
                                         Duarte, J.

We concur:


 /s/
Earl, P. J.


 /s/
Hull, J.

---

[27]  Defendant contends that resentencing must occur before a different judge.  Because we are not remanding for resentencing, we do not consider this argument.